# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

———————————

**No. ACM 39892**

———————————

**UNITED STATES**
*Appellee*

**v.**

**Xavius F. R. CAMPS**
Senior Airman (E-4), U.S. Air Force, *Appellant*

———————————

Appeal from the United States Air Force Trial Judiciary

Decided 21 December 2021

———————————

*Military Judge:* Wesley A. Braun.

*Sentence:* Sentence adjudged on 11 December 2019 by GCM convened at Joint Base Langley-Eustis, Virginia. Sentence entered by military judge on 4 February 2020: Dishonorable discharge, confinement for 46 months, and reduction to E-1.

*For Appellant:* Major Jenna M. Arroyo, USAF; Major Meghan R. Glines-Barney, USAF.

*For Appellee:* Major Alex B. Coberly, USAF; Major John P. Patera, USAF; Mary Ellen Payne, Esquire.

Before POSCH, RICHARDSON, and MEGINLEY, *Appellate Military Judges*.

Senior Judge POSCH delivered the opinion of the court, in which Judge RICHARDSON joined. Judge MEGINLEY filed a separate opinion concurring in part and dissenting in part.

———————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

———————————

POSCH, Senior Judge:

Contrary to his pleas, a general court-martial composed of a military judge sitting alone found Appellant guilty of one specification of committing abusive sexual contact upon AM, one specification of committing abusive sexual contact upon MM, and one specification of sexual assault of LW, in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920.[1] Also contrary to his pleas, Appellant was found guilty of one specification of assault consummated by a battery of AM, in violation of Article 128, UCMJ, 10 U.S.C. § 928.[2] Appellant was sentenced to a dishonorable discharge, confinement for 46 months, and reduction to the grade of E-1. The convening authority took no action on the findings or sentence, and the military judge entered the judgment of the court-martial without modification of the findings or sentence.

Appellant raises three assignments of error through counsel: (1) whether Appellant's convictions for abusive sexual contact of AM and MM, and assault consummated by a battery of AM, are legally and factually insufficient; (2) whether the military judge erred in admitting evidence under Mil. R. Evid. 413; and (3) whether the military judge erred in denying the use of a demonstrative aid during the testimony of an expert witness called by the Defense. In addition to these issues, Appellant personally raises two issues pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982): (4) whether Appellant was denied effective assistance of counsel when his trial defense counsel failed to admit exonerating evidence at trial; and (5) whether Appellant was denied effective assistance of counsel when his trial defense counsel failed to thoroughly interview a witness and develop that witness's testimony regarding the bias and motive of two other witnesses to fabricate their testimony at trial. In addition to these claims, we also address whether Appellant was prejudiced by the convening authority's decision to take no action on the sentence as required by Executive Order 13,825, § 6(b), 83 Fed. Reg. 9889, 9890 (8 Mar. 2018), and Article 60, UCMJ, 10 U.S.C. § 860 (*Manual for Courts-Martial, United States* (2016 ed.) (*MCM*)). We also consider the issue of timely appellate review.

We have considered issues (4) and (5), and we find they do not require further discussion or warrant relief. *See United States v. Matias*, 25 M.J. 356, 361

---

[1] References in this opinion to the punitive articles of the UCMJ and Article 60, UCMJ, 10 U.S.C. § 860, are to the *Manual for Courts-Martial, United States* (2016 ed.). The charges and specifications were referred to trial after 1 January 2019. Except where indicated, all other references to the UCMJ, the Rules for Courts-Martial, and Military Rules of Evidence are to the *Manual for Courts-Martial, United States* (2019 ed.).

[2] The remaining charges and specifications were withdrawn and dismissed by the convening authority or resulted in a finding of not guilty.

(C.M.A. 1987). We find Appellant's convictions both legally and factually sufficient, and no error materially prejudicial to the substantial rights of Appellant occurred. We thus affirm the findings and sentence.

## I. BACKGROUND

Appellant was assigned to Joint Base Langley-Eustis, Virginia, when evidence showed he committed the acts underlying the four convictions in the case under review. Among the issues Appellant raises on appeal are the legal and factual sufficiency of three convictions as they relate to two women, AM and MM. In this appeal, we decide Appellant's allegations of error and begin with his contention that the three convictions are legally and factually insufficient.

## II. DISCUSSION

### A. Legal and Factual Sufficiency

#### 1. Applicable Law

A Court of Criminal Appeals may affirm only such findings of guilty "as the Court finds correct in law and fact and determines, on the basis of the entire record, should be approved." Article 66(d)(1), UCMJ, 10 U.S.C. § 866(d)(1). In cases appealed by an accused, Congress "requires the Courts of Criminal Appeals to conduct a *de novo* review of legal and factual sufficiency of the case." *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted) (referencing Article 66(c), UCMJ, 10 U.S.C. § 866(c), contained in the *Manual for Courts-Martial, United States* (2016 ed.)). Our assessment of the findings is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). As a result, an examination for legal sufficiency "involves a very low threshold to sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (citation omitted).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are ourselves] convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (alteration in original) (quoting *Washington*, 57 M.J. at 399), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018).

**2. Abusive Sexual Contact and Assault Consummated by a Battery of AM**

*a. Additional Background*

The evidence at trial showed Appellant's convictions for committing abusive sexual contact and assault consummated by a battery upon AM were founded on an incident in Appellant's home in May 2018. Appellant's residence was a two-story townhome apartment he shared with several roommates. During the relevant period, Appellant let a female friend, DB, live in his apartment. DB did not have a bed of her own. At the time, DB was in a relationship with a woman, AM, and Appellant allowed them to sleep in his bed when he was away. Appellant would typically knock on the door on occasions when AM or DB were in the room and he came home in the middle of the night.

AM testified she was a light sleeper. In early May 2018 she awoke to the sound of Appellant returning home as she lay next to DB. When Appellant entered his bedroom, DB remained asleep and neither Appellant nor AM spoke. AM could see that Appellant was stumbling and he appeared drunk. AM had been lying on her side with her back just three to four inches from the wall. Appellant went to the bathroom, took off his shirt, and then crawled into his bed next to AM. He moved AM so that he was behind her and next to the wall where she had been sleeping. AM could smell alcohol on Appellant's breath, which confirmed to her that he had been drinking.

AM described "maybe a few seconds afterwards, [Appellant] put his arms around [her]," "and like held [her]." She acknowledged Appellant "wrap[ped] both hands around [her]" and she "fe[lt] his hands touch [her] thighs." She also acknowledged "feel[ing] his arms wrapping around [her] waist." She testified, "A few seconds after, I felt him get hard."[3] She described she felt Appellant's

---

[3] When asked what she meant by "felt him get hard," AM responded, "An erection, I think that's what it's called. Yeah."

erect penis pressing against her buttocks, and continued to feel it for "about 30 minutes." When she heard Appellant snoring and thought he had fallen asleep, she tried to move further away, but Appellant moved her back. AM explained, "I guess he woke up" and "I know for sure he moved me back," describing how Appellant "pulled [her] back and [they] just stayed like where [they] were the first time, when he did it the first time." AM further described that Appellant's arms remained wrapped around her body.

DB remained asleep despite AM's efforts to wake her to let her know what Appellant had done. AM eventually got out of the bed and went to the bathroom. AM texted a friend to let her know Appellant had lain next to her, explaining as she lay in bed that Appellant "ke[pt] getting closer & closer when [she] was moving away from him" and she "could feel everything he was doing or was trying to do." AM did not return to the bed, opting to sleep on the floor. When DB awoke, AM told her she had gotten up because there was no room in the bed. Appellant was "out cold" when DB got up that morning. AM attempted to wake Appellant up because he was supposed to take her to work. After the incident, AM did not again sleep in Appellant's bed.

AM did not formally report what happened that night until she was questioned much later by special agents of the Air Force Office of Special Investigations (AFOSI). However, a couple of days after the incident in question, she told Appellant she "didn't like what happened the other night," and, "Hey, don't make it a habit." Appellant responded that DB talked to him about it, but he "didn't think it was a big deal" and that he was sorry.

### b. Law and Analysis

For Appellant to be found guilty of committing abusive sexual contact upon AM in violation of Article 120, UCMJ, the Government was required to prove beyond a reasonable doubt three elements: (1) Appellant committed sexual contact upon AM by touching her buttocks; (2) Appellant caused bodily harm to AM by touching her; and (3) Appellant did so with the intent to gratify his own sexual desire. *See MCM*, pt. IV, ¶ 45.b.(7)(b). "The term 'bodily harm' means any offensive touching of another, however slight, including any . . . nonconsensual sexual contact." Article 120(g)(3), UCMJ, 10 U.S.C. § 920(g)(3).

The statutory definition of "consent" explains,

> The term "consent" means a freely given agreement to the conduct at issue by a competent person. An expression of lack of consent through words or conduct means there is no consent. Lack of verbal or physical resistance or submission resulting from the use of force, threat of force, or placing another person in fear does not constitute consent. A current or previous dating or social or sexual relationship by itself or the manner of dress

> of the person involved with the accused in the conduct at issue
> shall not constitute consent.

Article 120(g)(8)(A), UCMJ, 10 U.S.C. § 920(g)(8)(A); *see also MCM*, pt. IV, ¶ 45.a.(g)(8)(A). The definition further explains that "[l]ack of consent may be inferred based on the circumstances of the offense. All the surrounding circumstances are to be considered in determining whether a person gave consent, or whether a person did not resist or ceased to resist only because of another person's actions." Article 120(g)(8)(C), UCMJ, 10 U.S.C. § 920(g)(8)(C); *see also MCM*, pt. IV, ¶ 45.a.(g)(8)(C).

For Appellant to be found guilty of committing an assault consummated by a battery upon AM in violation of Article 128, UCMJ, the Government was required to prove beyond a reasonable doubt that Appellant did bodily harm to AM with unlawful force or violence. *See MCM*, pt. IV, ¶ 54.b.(2). Specifically, the Government alleged as the charged act that Appellant unlawfully touched AM on her leg with his hand during the incident in question. "Bodily harm" is defined as "any offensive touching of another, however slight," and the act "must be done without legal justification or excuse and without the lawful consent of the person affected." *MCM*, pt. IV, ¶ 54.c.(1)(a). "Unlawful force or violence" is demonstrated if an accused "wrongfully caused the contact, in that no legally cognizable reason existed that would excuse or justify the contact." *United States v. Bonner*, 70 M.J. 1, 3 (C.A.A.F. 2011) (citation omitted).

In our legal sufficiency review, we find no cause to challenge the factfinder's determination that Appellant was sufficiently awake and aware of his surroundings when he committed the charged offenses. On this record, a rational factfinder could infer Appellant's actions were voluntary and that he had the requisite intent for both offenses. When examining the evidence in the light most favorable to the Prosecution, "a rational factfinder[ ] could use his 'experience with people and events in weighing the probabilities' to infer beyond a reasonable doubt" that an element was proven. *United States v. Long*, 81 M.J. 362, 369 (C.A.A.F. 2021) (quoting *Holland v. United States*, 348 U.S. 121, 140 (1954)). Drawing every reasonable inference from the testimony in favor of the Prosecution, *Barner*, 56 M.J. at 134, the evidence legally supports Appellant's convictions. It does so even with the discrepancies noted by Appellant and our dissenting colleague as regards both convictions. Viewing the evidence in the light most favorable to the Prosecution, *Robinson*, 77 M.J. at 297–98, a rational factfinder could have found each element of the charged offenses against AM beyond a reasonable doubt. Therefore, the evidence is legally sufficient to support Appellant's convictions.

We then ask whether the evidence, although legally sufficient to support the convictions, is nevertheless unconvincing such that we are not persuaded of Appellant's guilt beyond a reasonable doubt. *Turner*, 25 M.J. at 325. In this

regard, our dissenting colleague takes exception to the voluntariness of the conduct underlying the charged offenses and proof of Appellant's sexual intent. Additionally, our colleague finds reasons to challenge the credibility of witnesses on whose testimony the findings of guilty necessarily depend. While this court has the independent authority and responsibility to weigh the credibility of witnesses in determining factual sufficiency, we recognize that the trial court saw and heard the testimony. *See United States v. Moss*, 63 M.J. 233, 239 (C.A.A.F. 2006) (stating it is the members' role to determine whether testimony is credible or biased). This court also recognizes that we, like the factfinder at trial, have a responsibility to weigh the probability that Appellant was awake and engaged in the charged conduct voluntarily and with the requisite intent. *Cf. Long*, 81 M.J. at 369 (observing appellate court may consider in its legal sufficiency review that a rational factfinder could weigh probabilities to infer that an element was proven beyond a reasonable doubt).

We are not persuaded by the claim that the Prosecution's proof was deficient. We find convincing proof of Appellant's guilt of both offenses from evidence that Appellant touched AM's body within seconds after he lay next to her in the bed where she was sleeping. In our judgment, AM's testimony that Appellant pulled her close as she tried to move away from him also overcomes reasonable doubt:

> Q [Assistant Trial Counsel]. Did you try to move away from the accused?
>
> A [AM]. Yes, when I felt like he was [a]sleep because he was snoring. So I was trying to move but he like--I guess he woke up and like moved me back because *I know for sure he moved me back because I tried to get up* but----
>
> Q. And for the record, the witness has kind of held her two hands in front of her in a fist and kind of pulled them back towards her stomach.
>
> . . .
>
> Q. When you say that he tried to move--you tried to move away but he pulled you back, how did he try to hold you back?
>
> A. *I guess like pulled me back and just stayed like where we were the first time, when he did it the first time.*
>
> Q. And for the record, the witness, again, put her hands in two fists in front of her and pulled them in towards her stomach.
>
> . . .
>
> Q. Are you saying that he--were his arms still wrapped around

you at that point?

A. Yes.

Q. And you were trying to get away?

A. Yes.

Q. Okay. And that's--when you tried to get away, *he pulled you back in with his arms that were still around you?*

A. *Yes.*

(Emphasis added).

A similar exchange occurred during more leading questions put to AM on cross-examination. Trial defense counsel referred back to this line of questions and asked, "Now you don't actually know for a fact if [Appellant] was ever awake, do you?" AM answered, "I can't say that, no. Well, he stopped snoring so I assumed that he was awake." Trial defense counsel also asked AM about a text message she sent to a friend when AM got away from Appellant: "What you had actually said was that he came and la[y] right next to you, right? 'He la[y] close AF,' which means close as f[**]k, correct?" AM answered, "Yes." Trial defense counsel then asked, "And you said he kept getting closer and closer when you were moving away, right?" AM answered, again, "Yes."

Our dissenting colleague makes the point that AM agreed with trial defense counsel that Appellant did not move, grind, or thrust his penis against her body. In our view of the evidence, AM did not need to use those or like words to convey what Appellant had done or his intent. Nor did she need to allege those actions for us to discern intent. It is enough that Appellant kept getting closer to her with his erect penis pressed against her buttocks as she tried to move away and that Appellant stopped snoring and pulled her back when she tried to get up. In her words, "I could feel everything he was doing or was trying to do."

The evidence shows both offenses were completed as Appellant lay down next to AM and before he had fallen asleep. AM testified that within seconds of Appellant climbing into bed he wrapped his arms around her body and touched her thigh. These acts occurred moments before she felt his erect penis. Such evidence belies reasonable doubt that Appellant was asleep, unconscious, that his conduct with AM was involuntary, or that he lacked sexual intent. AM's testimony that Appellant, with an erect penis, later moved her closer as she moved away likewise overcomes reasonable doubt about his actions and intent. At the same time, evidence proved beyond a reasonable doubt that Appellant did not have AM's freely given agreement to the offensive contact he caused to parts of her body. Having weighed the evidence, including challenges

made at trial and on appeal to AM's veracity, and her ability to perceive, remember, recall, and communicate,[4] we are nonetheless convinced of Appellant's guilt beyond a reasonable doubt. We reach this determination at the same time making allowances for not having personally observed the witnesses. Accordingly, we find Appellant's convictions for the offenses he committed upon AM are not just legally sufficient, but factually sufficient as well.

### 3. Abusive Sexual Contact of MM

#### a. Additional Background

Appellant's conviction for committing abusive sexual contact upon MM is founded on another incident in Appellant's apartment. Evidence showed that incident happened downstairs in the living room the morning after Appellant hosted a party in late May 2018. At the time, AM's sister, MM, had a boyfriend, TJ. Both MM and TJ went to the party and spent the night at the apartment.

The next morning after TJ departed the residence, Appellant came downstairs shirtless to get clothes he left on the couch in the living room. MM lay on her left side, on the floor where she spent the night. MM was under a comforter and wearing no pants, but she had on a long t-shirt that stopped slightly above her knees. Appellant asked MM, "Do you have underwear on?" At the time, MM was using her phone and responded, "Yeah, but that's none of your business." MM elaborated, testifying she asked Appellant, "[W]hy do you care, like why d[o] you need to know?" Appellant did not answer, but asked, "Can I lay next to you?" MM replied, "No, why?" MM remained occupied with her phone, facing away from Appellant, and she avoided making eye contact with him.

Without saying anything to her, Appellant then moved towards MM and lay beside her under the comforter. She felt Appellant's chest on her back. MM was still on her phone, facing away from Appellant and testified she "didn't know what he was doing." Appellant's actions prompted her to ask, "[W]hat are you doing, [and] like why are you lying next to me?" MM explained Appellant lifted her shirt and "that's when he started putting his hand on [her] leg," touching the side of her upper right thigh and "moving his hand towards [her] private area." MM told Appellant "stop" and pushed him with her hand, but

---

[4] We take exception to challenges to AM's candor in the dissenting opinion, particularly responses AM gave to questions about Appellant's erection. In light of evidence "[s]he had never felt a penis before" and her own testimony that she "d[id]n't know how that works," we do not conclude, as the dissent does, that "it should not have been this difficult for AM to explain what she felt, and . . . her confusion cuts across her believability as to what actually happened." Under the circumstances, we find the reasons advanced for any difficulty she had describing what happened are unremarkable, and do not support a conclusion that she was untruthful as a result.

then "he was closer and he was doing it again." MM again told Appellant "stop," pushed him, and said she was going to call TJ. Appellant then retrieved "whatever he had to grab and went back upstairs." Appellant's hand did not go under MM's underwear and he did not touch MM's vagina. MM testified she did not consent to Appellant touching her in the manner that he did. MM testified she did not consent to the touching and explained Appellant did not touch her private area "because [she] wouldn't let him."

Several weeks later, MM told TJ about the incident. TJ then confronted Appellant when four others including MM and AM were present. TJ testified Appellant told him to calm down because "[i]t's not that big of a deal." He further testified that Appellant's demeanor was "[n]onchalant and non-caring." Although Appellant looked confused about what TJ was confronting him about, TJ described Appellant's reaction as, "It seemed like he knew but [Appellant] was trying to play dumb."

### b. Law and Analysis

For Appellant to be found guilty of committing abusive sexual contact upon MM in violation of Article 120, UCMJ, the Government was required to prove beyond a reasonable doubt three elements: (1) Appellant committed sexual contact upon MM by touching her leg; (2) Appellant caused bodily harm to MM by touching her; and (3) Appellant did so with the intent to gratify his own sexual desire. *See MCM*, pt. IV, ¶ 45.b.(8)(b). "Bodily harm" has the same meaning as those words are used in the charged abusive sexual contact offense of AM discussed *supra*.

At trial, the Defense challenged MM's testimony with inconsistencies developed from pretrial statements she had given. However, MM maintained Appellant touched her leg in a sexual manner and without her consent. A rational factfinder could find beyond a reasonable doubt all the elements to support Appellant's conviction. Notably, Appellant's specific intent was shown by evidence he lifted MM's shirt, and then touched her upper thigh as he moved his hand toward her private area. In assessing factual sufficiency, after weighing all the evidence in the record of trial and having made allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt. Therefore, we find Appellant's conviction for abusive sexual contact of MM both legally and factually sufficient.

## B. Evidence Admitted under Mil. R. Evid. 413

Appellant moved at trial to exclude evidence the Prosecution intended to offer under Mil. R. Evid. 413. That evidence was the testimony of a female Airman, KH, whom Appellant kissed or attempted to kiss when she was alone with Appellant on the couch in his apartment.

Ruling from the bench, the military judge found Appellant was charged with sexual offenses under Article 120, UCMJ. He found Appellant committed a sexual offense against KH, and that a factfinder could find an intent to gratify a sexual desire. The military judge also found the evidence relevant, noting similarities between the incidents with KH and the charges before the court that involved sexual contact.

On appeal, Appellant claims the military judge erred in admitting the evidence because the incidents with KH "were not criminal and were extremely dissimilar to the offenses related to MM and AM, for which the military judge considered them." We find the military judge did not abuse his discretion in admitting this evidence under Mil. R. Evid. 413.

### 1. Additional Background

The military judge relied on statements KH made to AFOSI agents to rule on the motion. He found that on two different occasions, Appellant variously tried to kiss, or kissed, KH when she was a guest in his home.

On both occasions, the two sat on Appellant's couch in his living room. The first time, Appellant put his arms around KH and leaned in to kiss her. KH laughed and made a joke. Appellant stopped at this point. After Appellant tried again to kiss her, she told him to stop and she left shortly thereafter. The second occasion happened a few months later when KH returned to Appellant's residence. While watching television and sitting next to Appellant on his couch, Appellant leaned in to kiss her. The military judge found that KH acknowledged she "kissed him back on the first attempt, though she said she did it out of shock and in an attempt to push [Appellant] back." When Appellant tried to kiss her again, she told him to stop. Appellant again attempted to kiss her, and she again told him to stop, but this time more sternly than before. A few minutes later, Appellant again tried to kiss her. The military judge found her "mindset as not wanting to kiss [Appellant] and that she was laughing on both occasions when he attempted to kiss her and [that she] kissed him back during their first kiss."

Near the end of its case on the merits, the Prosecution called KH to testify about these incidents. Her testimony in findings was mainly consistent with the military judge's factfinding on the motion, and generally more detailed. She met Appellant in November 2017 when she photographed a party at his apartment. They kept in touch over the next couple weeks. One evening, KH told Appellant she was hungry, and Appellant invited KH to his home to have dinner. After eating dinner while sitting on the couch, Appellant put his arm on the couch behind her and leaned toward her. KH put her arm up to stop him and said, "Whoa," "Easy," or words to that effect. Appellant said, "I just really

like you." KH left shortly after this conduct. KH did not state whether Appellant tried to kiss her again that evening.

Early in 2018, Appellant invited KH to watch a movie, and she again was a guest in his home. As they sat on his couch, Appellant lay on her as she leaned away from him and rested her body on the arm of the couch. KH did not want Appellant to lie on her so she sat up. Appellant suggested they could "lay back down," and offered her a blanket, which she accepted. He then offered they could go up to his bedroom, which she declined. Appellant had his arm behind her on the couch and then "out of nowhere he just like leaned in and kissed [her]." She pushed him away and told him, "Easy, killer," "chill out," or words to that effect. In time, Appellant leaned in and kissed her again, "but this time it was . . . more like pushing into [her] face, like harder." KH told Appellant, "For real, stop," and told him, "I will leave if you keep doing this." When she noticed that Appellant started to lean in once more, she stood up and told Appellant it was time for her to go. After this incident, KH did not return to Appellant's residence again.

### 2. Law

We review a military judge's decision to admit evidence for an abuse of discretion. *United States v. Solomon*, 72 M.J. 176, 179 (C.A.A.F. 2013) (citation omitted). "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous." *Id*. (quoting *United States v. White*, 69 M.J. 236, 239 (C.A.A.F. 2010)).

#### a. Mil. R. Evid. 413

"In a court-martial proceeding for a sexual offense, the military judge may admit evidence that the accused committed any other sexual offense." Mil. R. Evid. 413(a). As relevant to the case under review "'sexual offense' means an offense punishable under the Uniform Code of Military Justice" involving "any conduct prohibited by Article 120" as well as an attempt to engage in such conduct. Mil. R. Evid. 413(d)(1) and (6). Once admitted, "[t]he evidence may be considered on any matter to which it is relevant," Mil. R. Evid. 413(a), to include an accused's propensity to commit a charged offense. *United States v. Parker*, 59 M.J. 195, 198 (C.A.A.F. 2003); *United States v. Wright*, 53 M.J. 476, 480 (C.A.A.F. 2000).

Three threshold requirements must be satisfied before admitting evidence under Mil. R. Evid. 413: (1) the accused must be charged with a sexual offense; (2) the proffered evidence must be evidence of the accused's commission of another sexual offense; and (3) the evidence must be relevant under Mil. R. Evid. 401 and 402. *See*, *e.g.*, *United States v. Berry*, 61 M.J. 91, 95 (C.A.A.F. 2005) (citing the three factors in *Wright*, 53 M.J. at 482, before the scope of Mil. R.

Evid. 413 changed from "offense[s] of sexual assault" to "sexual offense[s]"). In order to conclude there is evidence of another offense, a court must determine that the factfinder could find the other offense occurred by a preponderance of the evidence. *Wright*, 53 M.J. at 483 (citing *Huddleston v. United States*, 485 U.S. 681, 689–90 (1988)). "Evidence is relevant if (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Mil. R. Evid. 401. Relevant evidence is admissible unless applicable law provides otherwise. Mil. R. Evid. 402. Evidence that has "some tendency to make it more probable" that an appellant "committed a nonconsensual act against a vulnerable person" satisfies the relevancy test. *Berry*, 61 M.J. at 95.

A person who commits or causes sexual contact upon another by causing bodily harm to that person could be convicted of abusive sexual contact. The elements of this offense are the same as the elements for Appellant's abusive sexual contact conviction of MM in violation of Article 120(d), UCMJ, 10 U.S.C. § 920(d); *see also MCM*, pt. IV, ¶ 45.b.(8)(b).[5]

### b. Mil. R. Evid. 403

"[I]nherent in [Mil. R. Evid.] 413 is a general presumption in favor of admission," *Berry*, 61 M.J. at 94–95, but that presumption is overcome where a thorough balancing test under Mil. R. Evid. 403 requires exclusion of the evidence. *Id*. at 95 (citing *United States v. Dewrell*, 55 M.J. 131, 138 (C.A.A.F. 2001); *Wright*, 53 M.J. at 482–83).

Mil. R. Evid. 403 provides that although relevant, evidence may be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the members, undue delay, wasting time, or needlessly presenting cumulative evidence." In conducting this balancing test, the military judge should consider the following non-exhaustive factors to determine whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice:

> [T]he strength of the proof of the prior act; the probative weight of the evidence; the potential to present less prejudicial evidence; the possible distraction of the fact-finder; the time needed to prove the prior conduct; the temporal proximity of the prior event; the frequency of the acts; the presence of any intervening circumstances; and the relationship between the parties.

---

[5] No provision identical to *MCM*, pt. IV, ¶ 45.b.(8)(b) (proscribing sexual contact with "any body part of any person" and thereby causing bodily harm with the requisite specific intent), appears in the *Manual for Courts-Martial, United States* (2019 ed.), for charges and specifications alleging an offense committed on or after 1 January 2019.

*Berry*, 61 M.J. at 95 (citing *Wright*, 53 M.J. at 482).

In the Mil. R. Evid. 413 context, the Mil. R. Evid. 403 balancing test "should be applied in light of the strong legislative judgment that evidence of prior sexual offenses should ordinarily be admissible[.]" *Wright*, 53 M.J. at 482 (alteration in original) (internal quotation marks and citation omitted). "The importance of a careful balancing arises from the potential for undue prejudice that is inevitably present when dealing with propensity evidence." *United States v. James*, 63 M.J. 217, 222 (C.A.A.F. 2006). "[T]he term 'unfair prejudice' in the context of [Mil. R. Evid.] 403 'speaks to the capacity of some concededly relevant evidence to lure the *factfinder* into declaring guilt on a ground different from proof specific to the offense charged.'" *United States v. Collier*, 67 M.J. 347, 354 (C.A.A.F. 2009) (first alteration in original) (quoting *Old Chief v. United States*, 519 U.S. 172, 180 (1997)).

We review an application of Mil. R. Evid. 403 for an abuse of discretion. *See United States v. Manns*, 54 M.J. 164, 166 (C.A.A.F. 2000) (citations omitted). When a military judge conducts a proper Mil. R. Evid. 403 balancing on the record, we will not overturn that decision absent a clear abuse of discretion. *United States v. Stephens*, 67 M.J. 233, 235 (C.A.A.F. 2009). But, "[w]here the military judge is required to do a balancing test under [Mil. R. Evid.] 403 and does not sufficiently articulate his balancing on the record, his evidentiary ruling will receive less deference." *Berry*, 61 M.J. at 96 (citations omitted). "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be 'arbitrary, fanciful, clearly unreasonable,' or 'clearly erroneous.'" *United States v. McElhaney*, 54 M.J. 120, 130 (C.A.A.F. 2000) (quoting *United States v. Miller*, 46 M.J. 63, 65 (C.A.A.F. 1997); *United States v. Travers*, 25 M.J. 61, 62 (C.M.A. 1987)).

### 3. Analysis

The military judge did not abuse his discretion in finding the threshold requirements for admissibility of Mil. R. Evid. 413 evidence were met. *Berry*, 61 M.J. at 95. As found by the military judge, a factfinder could conclude that KH's testimony established attempted and completed abusive sexual contact of KH in violation of Articles 80 and 120(d), UCMJ, 10 U.S.C. §§ 880 and 920(d). Our dissenting colleague disagrees, finding that "[w]hatever KH's mindset may have been, her actions and statements appeared to have sent mixed messages to Appellant." However, it bears observing that the military judge made no such finding and Appellant did not testify on the matter. It follows that our colleague's conclusion that Appellant misunderstood KH is an inference derived from KH's testimony and statements she made before trial. In our judgment, a reasonable factfinder would not be compelled to reach the conclusion that Appellant misapprehended the circumstances to the exclusion

of other views. The findings the military judge did make were not clearly erroneous and he did not err in concluding that KH's testimony met the relevance requirements of Mil. R. Evid. 401 and 402. *Wright*, 53 M.J. at 483.

After KH testified on the merits, neither party asked the military judge to reconsider his ruling. To this end, we considered whether the evidence admitted on the merits, in conjunction with the evidence on which the ruling was based, could support a finding by a preponderance of the evidence that Appellant committed a previous sexual offense upon KH. We conclude that a reasonable factfinder could credit KH's testimony that Appellant persisted in kissing and attempting to kiss KH without her consent when KH twice visited Appellant in his home. In line with the evidence she gave, a factfinder could conclude Appellant did so after she manifested her objection and told him to stop several times. A factfinder could further conclude it was more likely than not that Appellant had the specific intent to gratify a sexual desire. Among the facts and circumstances that would lead to this conclusion are Appellant's persistence and KH's testimony on the merits that Appellant offered they could go upstairs to his bedroom, and Appellant then unexpectedly leaned in and kissed her when she declined.

The dissent concludes that Appellant's behavior with KH was not criminal. Our colleague cautions any Airman "who attempts to further a relationship with something as basic as a simple kiss" to first obtain "unequivocal, and perhaps documented, consent" because "anything less may now be deemed criminal." Perhaps it says something about our culture to associate unwanted kissing with affection, and not aggression. Yet, nothing in our Mil. R. Evid. 413 jurisprudence compels a factfinder to be beholden to the most innocent and well-meaning view of the evidence.

Here, it is enough to follow the evidence and determine what a reasonable factfinder could conclude under the circumstances. *See Wright*, 53 M.J. at 483 (citing *Huddleston*, 485 U.S. at 689–90) ("requiring the judge to conclude that the jury could find by preponderance of the evidence that the offenses occurred"). The record shows that, time and again, Appellant either kissed KH, or tried to, under circumstances in which a factfinder could conclude by a preponderance of the evidence that KH communicated to Appellant that such contact was unwanted by her—so much so that she got up and left and never returned.

A reasonable factfinder could conclude that KH's testimony was proof of another sexual offense. Therefore, the military judge did not err in finding it relevant to prove the charged conduct. Her testimony had "some tendency to make it more probable" that Appellant "committed a nonconsensual act against a vulnerable person." *See Berry*, 61 M.J. at 95; *see also MCM*, pt. IV,

¶ 45.b.(8)(b) (describing elements of the offense of abusive sexual contact involving the touching of any body part of any person). Evidence involving KH was relevant to the charged abusive sexual contact of AM who testified how Appellant kept moving closer to her in bed even as she moved away. It was also relevant to the charged abusive sexual contact of MM, who twice pushed Appellant away and told him to stop when he repeatedly touched her leg with his hand when she, like KH, was a guest in his home.

The military judge articulated the *Wright* factors and his Mil. R. Evid. 403 balancing analysis. The military judge found: (1) KH's recollection "descriptive" and that "[h]er ability to recall what happened is convincing;" (2) that KH would present the information personally to the court; (3) the testimony she would provide was more than mere gossip; (4) her testimony was "sufficiently reliable and has the adequate strength to support admission;" (5) the testimony was "incredibly probative;" (6) the court was unaware of any less prejudicial evidence on this matter, as KH's testimony was the only source of the information to be provided; (7) KH's testimony would not lead to an unnecessary and undue delay; (8) that the temporal proximity between the evidence being admitted under Mil. R. Evid. 413 and the charged conduct were "close in time and actually overlap with the charged offenses;" (9) there were no significant intervening circumstances between the evidence being offered under Mil. R. Evid. 413 and the charged offenses; and (10) although KH appeared to have been an acquaintance or friends with some of the other victims in the case, the military judge did not have any concerns regarding those relationships and impact of the reliability of the evidence being proffered. The military judge concluded Mil. R. Evid. 403 did not require exclusion of the evidence offered under Mil. R. Evid. 413.

We find the military judge did not abuse his discretion in conducting his Mil. R. Evid. 403 balancing analysis. Among the non-exhaustive Mil. R. Evid. 403 considerations are the strength of the proof of the prior act and the probative weight of the evidence. *Berry*, 61 M.J. at 95 (citing *Wright*, 53 M.J. at 482). Unlike the dissenting opinion that finds KH "appeared to have sent mixed messages to Appellant," as it bears on the Mil. R. Evid. 403 balancing test, our first instinct is not to conclude that a factfinder would simply brush off Appellant's conduct as a flirting mishap, or that it was Appellant as the provocateur, and not KH, who was confused about what was happening on Appellant's couch. If this court was the factfinder de novo—and our knowledge of human nature was our guide—we might give considerable latitude to how a person reacts to what the evidence showed was repeated unwelcome attention. The military judge did not err in finding "that the evidence's probative value . . . is not outweighed by any significant prejudice, and therefore, the evidence is admissible under Military Rule of Evidence 403."

In light of the standards articulated in *Berry* and *Wright*, we find the military judge did not abuse his discretion in admitting KH's testimony under Mil. R. Evid. 413.

**C. Use of Demonstrative Aid during Expert Testimony**

Appellant was convicted of sexually assaulting a female Airman, LW, in her dorm room on Joint Base Langley-Eustis, Virginia. On appeal, Appellant requests we set aside his conviction because the military judge erred in denying the use of a demonstrative aid during the testimony of an expert witness called by the Defense. We find the military judge did not err.

**1. Additional Background**

In 2016, Appellant and LW met at a party Appellant hosted at his apartment. They exchanged contact information, flirted a few times, and, on at least one occasion, she joined Appellant at his home for dinner. One evening in the summer of 2016, Appellant went to the base to meet friends. He sent LW a message asking if he could stay in her dorm room until his friends were ready. LW agreed and Appellant stopped by her room.

Appellant had not been to LW's room before. He sat in a chair opposite the bed where LW sat. Although they talked for an hour and a half, she later could not remember what they talked about, but she recalled the conversation was not sexual in nature as their relationship was nothing more than a friendship. In time, LW fell asleep with the lights on when Appellant was still in her room.

After initially falling asleep as she lay on her back, LW felt Appellant's hands on her stomach, then inside her underwear through the top waistband of her gym shorts. Then she felt his fingers inside her vagina for about half a minute before she grabbed Appellant's wrist and pushed him away. LW testified that because Appellant had long fingernails, she could "feel them kind of like scratching against [her]." While Appellant's fingers were inside her vagina, LW stated her eyes were still closed and she was still asleep. When Appellant removed his fingers from inside of her she "snapped out of it and woke up." She saw Appellant sitting at the foot of her bed. LW did not remember if she talked to Appellant after he penetrated her vagina with his fingers. Appellant eventually left her room. LW testified she did not consent to Appellant putting his fingers into her vagina, and did not give him any reason to believe that she would consent to his conduct.

Although Appellant and LW did not directly discuss what happened, about one or two months later Appellant sent LW a message that he "miss[ed] [their] friendship" and that he was "sorry about what happened between [them]." LW testified she forgave Appellant, but LW did not spend time with him anymore.

At trial, the Defense challenged LW's description of her positioning on the bed when Appellant was alleged to have assaulted her during the incident in question. The Defense presented the testimony of a medical doctor who was present during LW's testimony and whom the court recognized as an expert in obstetrics and gynecology. The expert testified it "seemed impossible" for Appellant to have been able to "access her vaginal area" based on LW's testimony and the positioning of Appellant. To demonstrate that difficulty, trial defense counsel sought to utilize "[a] mannequin of the lower torso and pelvis" as a demonstrative aid. Trial counsel objected to the use of the mannequin as misleading. After allowing trial defense counsel to lay a foundation for the use of the mannequin, and evaluating the evidence under Mil. R. Evid. 403, the military judge sustained trial counsel's objection and did not allow the Defense to use the mannequin as a demonstrative aid.

**2. Law**

An appellate court reviews a military judge's ruling to admit or exclude expert testimony over a defense objection for an abuse of discretion. *United States v. Ellis*, 68 M.J. 341, 344 (C.A.A.F. 2010) (citation omitted). "A military judge abuses his discretion when: (1) the findings of fact upon which he predicates his ruling are not supported by the evidence of record; (2) if incorrect legal principles were used; or (3) if his application of the correct legal principles to the facts is clearly unreasonable." *Id*. (citing *United States v. Mackie*, 66 M.J. 198, 199 (C.A.A.F. 2008) (per curiam)). In applying the Mil. R. Evid. 403 balancing test, military judges enjoy "wide discretion." *Manns*, 54 M.J. at 166 (citations omitted). However, we give less deference to military judges' decisions if they do not explain their analysis on the record, and we give military judges no deference when they fail to conduct the analysis at all. *Id*. (citations omitted).

Demonstrative evidence "is generally that which illustrates or clarifies the testimony of a witness." *United States v. Heatherly*, 21 M.J. 113, 115 n.2 (C.M.A. 1985). Demonstrative evidence is admitted solely to help witnesses explain their testimony. *Carson v. Polley*, 689 F.2d 562, 579 (5th Cir. 1982). "[I]f the evidence is used to prove a complex, central, or difficult to understand point, [then] it may have a place in the court-martial." *United States v. Pope*, 69 M.J. 328, 332 (C.A.A.F. 2011) (alterations in original) (citation omitted). However, "[d]emonstrative exhibits are inadmissible where they do not illustrate or make clearer some issue in the case; that is, where they are irrelevant, or where the exhibit's character is such that its probative value is substantially outweighed by the danger of unfair prejudice." *Id*. (alteration in original) (citations omitted).

"The decision to permit or deny the use of demonstrative evidence generally has been held to be within the sound discretion of the trial judge." *Id.* (quoting *Heatherly*, 21 M.J. at 115 n.2).

### 3. Analysis

The military judge did not abuse his discretion in ruling to deny the use of the mannequin during the testimony of the Defense's expert witness. The military judge observed that while the aid was "an anatomical dummy that's used to train medical professionals," it could not account for other variables including "the length of [LW's] legs, the length of [Appellant's] arms, the size of the bed in the dorm room . . . , her exact positioning on the bed, [and] the exact positioning of [Appellant]." These were variables that the military judge was confident had not been "accurately considered [for] this demonstration." The military judge expressed concern that the proffered demonstration would not "correctly depict what it's attempting to demonstrate." Although the military judge found the aid to be relevant, he stated that the court-martial was in a judge-alone forum, and he was "confident in [his] abilities to assess the testimony provided by the victim, vice the testimony as recalled by the [expert] witness." Conducting a proper balancing test under Mil. R. Evid. 403, the military judge found that the aid's "ability to cause confusion or mislead is substantially outweighing [the] probative effect that [it] would have," and denied the use of the mannequin as a demonstrative aid.

We disagree with Appellant's claim that the expert's ability to meaningfully testify was hindered by the ruling. The record yields no reason to believe the military judge had difficulty understanding the expert's testimony. Recognizing that the military judge articulated his rationale under Mil. R. Evid. 403 for denying the use of the aid, and had wide discretion to allow or prohibit it, we find no error.

### D. Convening Authority's Decision on Action

#### 1. Additional Background

Appellant's court-martial adjourned on 11 December 2019 when the sentencing hearing concluded. On 23 December 2019, Appellant's trial defense counsel asked the convening authority to defer automatic forfeitures until entry of judgment, and to waive such forfeitures for the benefit of Appellant's dependent son. Trial defense counsel asked for the waiver to begin when judgment was entered and to run for a period of six months. That request did not discuss whether Appellant intended to submit additional matters for the convening authority's consideration, or indicate whether Appellant had already submitted matters in clemency.

On 8 January 2020, the convening authority signed a Decision on Action memorandum. In that memorandum, the convening authority denied Appellant's request to defer and waive the automatic forfeitures. The convening authority also indicated he took no action on the findings or sentence. He also stated, "Before declining to take action in this case, I considered matters timely submitted by the accused under [Rule for Courts-Martial (R.C.M.)] 1106."

On 15 October 2021, we ordered the Government to inform this court in writing as to whether Appellant submitted matters under R.C.M. 1106 to the convening authority and if so, to provide this court written evidence of such matters. The Government replied that trial defense counsel's 23 December 2019 request of the convening authority to defer and waive automatic forfeitures was Appellant's sole post-trial submission to the convening authority. A post-trial declaration supports the Government's contention that Appellant did not request the convening authority provide any other relief, to include relief on the adjudged reduction in grade.

### 2. Law and Analysis

At the time the convening authority signed the Decision on Action memorandum in this case, Air Force Instruction (AFI) 51-201, *Administration of Military Justice*, Section 13D (18 Jan. 2019), advised convening authorities to apply the version of Article 60, UCMJ, in effect at the time of the earliest offense.[6] At the same time, the instruction equated a convening authority's decision to take "no action" with granting no clemency relief, explaining:

> A decision to take action is tantamount to granting relief, whereas a decision to take no action is tantamount to granting no relief. Granting post-sentencing relief (i.e. "taking action") is a matter of command prerogative entirely within the discretion of the convening authority, as limited by the applicable version of Article 60, UCMJ.

AFI 51-201, ¶ 13.17.1.

During the pendency of this appeal, the United States Court of Appeals for the Armed Forces (CAAF) decided *United States v. Brubaker-Escobar*, __ M.J. __, No. 20-0345, 2021 CAAF LEXIS 818 (C.A.A.F. 7 Sep. 2021) (per curiam), holding:

> [I]n any court-martial where an accused is found guilty of at least one specification involving an offense that was committed

---

[6] Specifically, AFI 51-201, ¶ 13.16, stated: "To determine the applicable version of Article 60, look at the date of the earliest offense resulting in a conviction. The version of Article 60 in effect on that date applies to the entire case."

> before January 1, 2019, a convening authority errs if he fails to
> take one of the following post-trial actions: approve, disapprove,
> commute, or suspend the sentence of the court-martial in whole
> or in part.

*Id*. at *1.

In *Brubaker-Escobar*, the CAAF found the convening authority's failure to explicitly take one of those actions was a "procedural error." *Id*. at *2, *7–8. The court noted: "Pursuant to Article 59(a), UCMJ, 10 U.S.C. § 859(a) (2018), procedural errors are 'test[ed] for material prejudice to a substantial right to determine whether relief is warranted.'" *Id*. at *8 (alteration in original) (quoting *United States v. Alexander,* 61 M.J. 266, 269 (C.A.A.F. 2005)). The court held the convening authority's error in taking "no action" was harmless because the appellant did not request clemency and the convening authority could not have granted meaningful clemency regarding any portion of the adjudged sentence. *Id*.

In this case, the convening authority made a procedural error when he took no action on the sentence. In testing for prejudice, we have examined the convening authority's decision on action and find Appellant suffered no material prejudice to a substantial right. We reach this conclusion for two reasons.

To begin with, the convening authority was powerless to grant clemency on the adjudged findings, Article 60(c)(3)(A), UCMJ, 10 U.S.C. § 860(c)(3)(A); and, as to the sentence, could only disapprove, commute, or suspend, in whole or in part, the adjudged reduction in grade, Article 60(c)(4)(A), 10 U.S.C. § 860(c)(4)(A). However, Appellant did not seek clemency relief for the reduction in grade. Appellant did not raise a motion under R.C.M. 1104(b)(2)(B) to challenge the form or legality of the convening authority's decision, nor has Appellant asserted on appeal that the convening authority erred in taking no action on this sentence component.

Second, we can glean the convening authority's intention from the words in the Decision on Action memorandum and the Air Force guidance that was in effect when the convening authority made this decision. Taking "no action" on the sentence was "tantamount to granting no relief." *See* AFI 51-201, ¶ 13.17.1. To be sure, the convening authority followed that instruction to his detriment by using language suited to the newer version of Article 60, UCMJ, which was inapplicable to Appellant's case. Even so, "no action" is a term of art with a regulatory meaning that unmistakably conveys an intention to grant no sentencing relief to Appellant.

Under the circumstances, we do not liken the convening authority's affirmatively taking "no action," on the one hand, with utter silence tantamount to

an outright failure to act when action is required, on the other. Thus, we conclude Appellant was not prejudiced by the procedural error in the convening authority's decision.

### E. Timeliness of Appellate Review

#### 1. Law

Whether an appellant has been deprived of his due process right to speedy post-trial and appellate review, and whether constitutional error is harmless beyond a reasonable doubt, are questions of law we review de novo. *United States v. Arriaga*, 70 M.J. 51, 56 (C.A.A.F. 2011) (citing *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006)).

A presumption of unreasonable delay arises when appellate review is not completed and a decision is not rendered within 18 months of the case being docketed. *Moreno*, 63 M.J. at 142. If there is a *Moreno*-based presumption of unreasonable delay or an otherwise facially unreasonable delay, we examine the claim under the four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice." *Moreno*, 63 M.J. at 135 (citations omitted). *Moreno* identified three types of prejudice arising from post-trial processing delay: (1) oppressive incarceration; (2) anxiety and concern; and (3) impairment of a convicted person's grounds for appeal and ability to present a defense at a rehearing. *Id.* at 138–39 (citations omitted).

"We analyze each factor and make a determination as to whether that factor favors the Government or [Appellant]." *Id.* at 136 (citation omitted). Then, we balance our analysis of the factors to determine whether a due process violation occurred. *Id.* (citing *Barker*, 407 U.S. at 533 ("Courts must still engage in a difficult and sensitive balancing process.")). "No single factor is required for finding a due process violation and the absence of a given factor will not prevent such a finding." *Id.* (citation omitted). However, where an appellant has not shown prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006).

Recognizing our authority under Article 66(d), UCMJ, we also consider if relief for excessive post-trial delay is appropriate even in the absence of a due process violation. *See United States v. Tardif*, 57 M.J. 219, 221, 225 (C.A.A.F. 2002).

### 2. Analysis

Appellant's case was docketed with the court on 22 April 2020. The overall delay in failing to render this decision within 18 months of the case being docketed is facially unreasonable. *See Moreno*, 63 M.J. at 142. However, we determine no violation of Appellant's right to due process and a speedy appellate review. Less than two months have passed since 23 October 2021, when the delay became facially unreasonable. The reasons for the delay include the time required for Appellant to file his brief on 20 August 2020. Appellee submitted its answer on 19 October 2020, and Appellant replied to the answer on 26 October 2020. Additionally, on 9 July 2021, this court granted Appellant's 23 June 2021 Motion for Leave to File Supplemental Assignment of Error, with respect to issue (5). Appellee answered on 23 August 2021.

Analyzing the *Barker* factors, we find the delay is not excessively long.[7] The length of the delay is partially due to a second round of pleadings that the court authorized almost eight months after Appellant submitted his reply brief. The reason for the delay includes time that was dedicated to ruling on motions that are related to the supplemental assignment of error.[8] Another reason is the time it took for the Government to resolve whether Appellant had submitted matters under R.C.M. 1106 for the convening authority's consideration.

Appellant has not asserted his right to speedy appellate review or pointed to any particular prejudice resulting from the presumptively unreasonable delay, and we find none. To the contrary, Appellant submitted a declaration with his supplemental assignment of error, which cited *Moreno* and stated that he waived his speedy appellate rights. However, we are not bound by such waiver. *See United States v. Hardy*, 77 M.J. 438, 442–43 (C.A.A.F. 2018); *United States v. Chin*, 75 M.J. 220, 223 (C.A.A.F. 2016) (citation omitted) (addressing this court's responsibility to "assess the entire record to determine whether to leave an accused's waiver intact, or to correct the error").

Finding no *Barker* prejudice, we also find the delay is not so egregious that it "adversely affects the public's perception of the fairness and integrity of the military justice system." *See Toohey*, 63 M.J. at 362. As a result, there is no due process violation. *See id*. We determine Appellant is not due relief even in

---

[7] We granted three enlargements of time–one for Appellant and two for Appellee— before the case was joined when Appellee submitted its answer on 19 October 2020.

[8] On 12 July 2021, Appellee filed a Motion to Compel Declarations or Affidavits from Appellant's three trial defense counsel to respond to allegations of ineffective assistance of counsel that Appellant raised in his supplemental assignment of error. We granted that motion in a 9 July 2021 order of the court along with granting Appellee's Motion for Enlargement of Time to answer Appellant's assignment of error once Appellee received all affidavits or declarations that were responsive to the court's order.

the absence of a due process violation. *See Tardif*, 57 M.J. at 223–24. Applying the factors articulated in *United States v. Gay*, 74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016), we find the delay in appellate review justified and relief for Appellant is not warranted.

## III. CONCLUSION

The findings and sentence entered are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and the sentence are **AFFIRMED**.

MEGINLEY, Judge (concurring in part and dissenting in part):

Appellant faced five charges with a total of 15 specifications. In total, there were initially eight alleged victims. Appellant was found not guilty of seven specifications of sexual assault in violation of Article 120, UCMJ, 10 U.S.C. § 920. Three additional specifications of sexual assault in violation of Article 120, UCMJ, and one specification of attempted sexual assault, in violation of Article 80, UCMJ, 10 U.S.C. § 880, were withdrawn and dismissed after arraignment. These are important facts to give some perspective as to what Appellant faced after his case was referred and to resolve the raised issues.

The record of trial (ROT) shows that Appellant led a sexually charged lifestyle, and certainly suggests that he pushed the limits of what could be deemed legally, morally, and socially acceptable behavior. Appellant's crimes against two of those women, LW and MM, rightfully earned him convictions for those offenses. As such, I agree with the majority in that Appellant's conviction against MM is factually and legally sufficient. I also agree that there was no evidence Appellant's trial defense counsel were ineffective and that Appellant did not suffer any prejudice as a result of the convening authority's failure to take action, or as a result of appellate delay. However, I find the military judge abused his discretion by allowing the testimony of KH under Mil. R. Evid. 413. More importantly, I disagree with the majority's analysis on whether Appellant's convictions for his alleged offenses against AM are legally and factually sufficient. For Appellant's Article 120, UCMJ, offense against AM, I find that conviction legally and factually insufficient; for the Article 128, UCMJ, offense, I find it factually insufficient.

## A. The Military Judge Abused his Discretion Allowing Evidence Under Mil. R. Evid. 413 Related to KH

As described by KH, I do not believe that Appellant's behavior towards KH was criminal in nature, or that his behavior towards KH was similar to the

offenses relating to MM and AM, for which the military judge considered them. The Government sought to offer evidence under Mil. R. Evid. 413 that Appellant *kissed, or attempted to kiss*, KH without her permission, while at Appellant's residence in late 2017 or early 2018. KH did not report Appellant's actions to law enforcement, and it was only after trial counsel contacted and interviewed KH, that she was interviewed by agents from the Air Force Office of Special Investigations (AFOSI), an interview that was videotaped, which was the evidence the military judge relied on to make his ruling.

In KH's interview, she discussed how on two occasions Appellant tried to, or did in fact, kiss her. On the first of these occasions, the military judge found that while at Appellant's residence, Appellant tried to kiss KH. Appellant put his arms around KH and went in to kiss her. KH laughed and made a joke. Appellant stopped at this point. After Appellant tried again to kiss KH, she told him to stop; she then left Appellant's residence. The second occasion was the basis for the Government's motion, where a few months later KH went back to Appellant's residence to watch television. While sitting next to Appellant on his couch, Appellant leaned in to kiss KH. KH acknowledged she *kissed him back* on the first attempt, though she said she did it out of shock and in an attempt to push Appellant back. When Appellant tried to kiss her again, KH told him to stop. Appellant again attempted to kiss KH, but she said more sternly, that he should stop. A few minutes later, Appellant again tried to kiss KH. The military judge also found that, even though KH was laughing on two of the attempted kisses, she "described her mindset as not wanting to kiss [Appellant]."[1]

Appellant was arraigned on 16 October 2019 and his trial began on 4 December 2019. In ruling on this issue, the military judge stated, "[O]n 31 October 2019, trial counsel interviewed [KH] about how she knew the accused. *During this interview, [KH] was notified that she had reported a potential crime and AFOSI was notified*. On 1 November 2019 in an interview with the [AFOSI], [KH] recounted events when she went to [Appellant's] apartment . . . ." (Emphasis added). Thus, according to the military judge, prior to 31 October 2019, there is no indication that KH thought she was a victim of a crime – it almost sounds as if the military judge found that the trial counsel had told

---

[1] With the consent of the parties, the military judge adopted this fact from the Defense's motion. I note KH's somewhat contradictory testimony in findings. Although she described in greater detail Appellant's aggressive behavior towards her, she also acknowledged she believed she told AFOSI, "I don't think he had to ask me before he kissed me," suggesting Appellant did in fact have some leeway to initially kiss her.

KH that she was a victim. If this is the case, arguably, trial counsel and AFOSI appeared to have manufactured KH as a victim, not KH herself.[2]

Nonetheless, there was no evidence Appellant tried to force KH to stay, nor evidence of violence, or sexual assault. In fact, KH must have felt comfortable enough with Appellant to go back to his apartment a second time, where she laughed with Appellant and kissed him back. When Appellant became "too much," she left. In other words, after KH rebuffed Appellant's advances, she left his apartment. There is one more point worth noting: in the Government's response to the Defense's motion to exclude KH's testimony, trial counsel advised the military judge,

> Of importance, at the time the incident occurred, a forced kiss constituted abusive sexual contact under Article 120, UCMJ. In short, the definition of sexual contact in Article 120(g)(2) is now delimited to touching eight (8) specified body parts, vice "any body part" as was previously the case prior 1 Jan 19.

Assuming that kissing, or trying to kiss, KH was in fact a crime at the time it occurred, under the *Manual for Courts-Martial, United States* (2016 ed.), by the time this case made it to trial in December 2019, it was not. *See United States v. Palacios Cueto*, No. ACM 39815, 2021 CCA LEXIS 239, *65–67 (A.F. Ct. Crim. App. 18 May 2021) (Meginley, J., dissenting) (unpub. op.). The fact that there was a significant change in the law was a factor that should have been considered by the military judge.

Under Mil. R. Evid. 413, there had to be a sexual offense; based on KH's words, I do not believe this is as such. Even if I were to accept that Appellant may have committed a crime against KH by kissing her or attempting to kiss her, I do not believe the incident between KH is similar to those incidents between AM and MM. Further, even if KH's testimony was relevant, inclusion of KH's testimony fails the Mil. R. Evid. 403 balancing test, as the probative value of KH's testimony was substantially outweighed by the danger of unfair prejudice. The strength of the proof was not great – the military judge essentially relied on KH's "mindset" from a taped interview that occurred mere weeks before trial, by an individual who did not report anything criminal. Whatever KH's mindset may have been, her actions and statements appeared to have sent mixed messages to Appellant, which is tacitly acknowledged by the military judge, who stated in his ruling that KH "described her mindset as not

---

[2] In its motion to exclude KH's testimony, the Defense stated that "Trial counsel interviewed [KH] about how she knew [Appellant]. Trial counsel began this interview by telling [KH] [Appellant] was under investigation for sexual assault. At the conclusion of the interview, trial counsel directed that [KH] should speak to [AF]OSI because of 'mandatory reporting.'"

wanting to kiss [Appellant], but stated that she was laughing on at least two of the occasions, when he attempted to kiss her, and did indeed kiss him back on that first occasion." KH's "mindset" goes directly to relevancy under Mil. R. Evid. 403 and the strength of proof. I also believe that KH's testimony was misleading as to Appellant's criminality and frankly an unnecessary distraction in a case that initially involved eight alleged victims. Based on the law (and the change in the law), allowing KH's testimony was arbitrary and clearly unreasonable, and ultimately, an abuse of discretion. Nonetheless, given the overall case presented against Appellant, I do not believe inclusion of KH's testimony did material harm to Appellant, nor do I believe it had a substantial influence on the findings related to MM; if anything, the ruling helps him regarding the legal and factual sufficiency of AM's charges (to be discussed shortly).

There is a practical aspect to this disconcerting finding: every young man (or woman) who is subject to the Uniform Code of Military Justice, who attempts to further a relationship with something as basic as a simple kiss (or an attempt to kiss) should be prepared to ask for unequivocal, and perhaps documented, consent. If this is the road we are going down, without as much, anything less may now be deemed criminal. *See Palacios Cueto*, 2021 CCA LEXIS 239, at \*72–73 (where appellant was convicted of abusive sexual contact for kissing his victim (and touching her stomach), resulting in possible sex offender registration).

## B. Allegations Involving AM

With that said, the inclusion of KH's propensity evidence, along with other matters considered under Mil. R. Evid. 404(b), shows the Government went to great lengths to paint a picture of an accused who pushed the boundaries with women, with a fairly consistent pattern of behavior. However, the facts surrounding Appellant's interactions with AM are not entirely consistent with his established pattern of behavior. This, coupled with AM's numerous inconsistencies, leads me to find that Appellant's Article 120, UCMJ, conviction against AM is legally and factually insufficient and that his conviction under Article 128, UMCJ, is factually insufficient.

The alleged incidents against AM occurred in early May 2018. When they happened, DB was also in the bed. A brief background on DB: DB met Appellant in May 2017 and became friends. At that time, DB was in a relationship and was not romantically interested in Appellant. However, DB alleged that Appellant sexually assaulted her in September 2017 at DB's residence. There were no other witnesses to Appellant's acts, and Appellant, who was charged with a sexual offense against DB, was acquitted of that allegation.

Notwithstanding this incident in September 2017, DB continued to talk to Appellant, went to watch Appellant play soccer (and provide him moral support), and in May 2018,[3] although he had allegedly sexually assaulted her, DB actually moved into Appellant's apartment. Appellant did not charge DB rent and she only had to buy groceries for herself. Appellant and DB also had a third roommate, FD (another female, who also made an allegation of sexual assault against Appellant), who moved into Appellant's residence around September 2017. DB lived with Appellant for six to seven months. Before moving in with Appellant, in March 2018, DB entered into her relationship with AM, and told AM that Appellant had sexually assaulted her.

Even though it is unclear if DB had actually moved in with Appellant on 5 May 2018, the record shows that DB had stayed there previously, as AM testified that Appellant would let her and DB sleep in his bed. There was no indication from AM that Appellant allowed her and DB to sleep in his bed on the night of the alleged incidents, or if Appellant even knew AM and DB were in his bed when he came into his bedroom. It is also unknown when Appellant came into his bedroom and got into his bed when AM was in it. AM testified Appellant got in bed and laid next to her; he also "reeked" of alcohol. Finally, when Appellant got into bed with AM, there was no conversation between them.[4] In terms of positioning in the bed, AM testified to the following:

> Q. [Trial counsel] So, then you said he got into the bed. Can you kind of describe how far were you from the wall would you say?
>
> A. [AM] It had to be like three or four inches from the wall.
>
> Q. Okay. So, you were fairly close to the wall?
>
> A. Yes.
>
> Q. And you said your back was to the wall. Were you lying on your side?
>
> A. Yes.
>
> Q. What did [Appellant] do in terms of to get into the bed?
>
> A. He like, I guess crawled inside and like moved me so he would be next to the wall and I was kind of like more out from the wall.
>
> Q. Okay. Were you still lying on your side at that point?
>
> A. Yes.

---

[3] When asked by the Defense if she moved in with Appellant in June 2018, DB responded "around that time."

[4] AM noted she was wearing shorts and a shirt.

Q. And so, he was lying behind you?

A. Yes.

Q. Once he got into the bed and he was lying behind you, what did he do next?

A. It was like maybe a few seconds afterwards, he put his arms around me.

"A few seconds" after Appellant got into the bed, he put his arms around AM, and wrapped both of his hands around AM. AM felt Appellant's hands touch her thighs and then wrapped around her waist. "A few seconds" after that, AM felt Appellant's hands touching her thigh and waist and AM felt Appellant get an erection against her buttocks. For the majority, this information, which was elicited on direct, seems to end their analysis.

However, the remainder of AM's testimony cuts against Appellant's intent, or lack thereof, as well as AM's own credibility. The most glaring issue is whether Appellant was even awake when the assault, and subsequent sexual assault, occurred:

Q. [Trial defense counsel] Now, [Appellant] didn't say anything when he got into bed, right?

A. [AM] No.

Q. And he didn't say anything the whole time that he was laying there?

A. No, except for snoring.

Q. And he was snoring for upwards of 30 minutes, right?

A. Yes.

Q. And his breath was reeking of alcohol the entire time?

A. Yes.

Q. Now you testified on direct that you guess he woke up because you tried to get up and he put his hands on your stomach and pulled you back towards him, right?

A. Yes.

Q. Now you don't actually know for a fact if [Appellant] was ever awake, do you?

A. *I can't say that, no. Well, he stopped snoring so I assumed that he was awake.*

Q. Okay. Fair enough. So, you assumed he was awake because he stopped snoring? Is that right?

A. Yes.

(Emphasis added).

AM's testimony up to this point suggests that she could have moved away from Appellant after he got into his bed, but before he touched her, and, Appellant fell asleep quickly once he got into his bed. (AM later clarified that when Appellant wrapped his arms around her, he was not snoring, nor was he snoring when she first felt his penis).

Yet, AM *could not testify as to whether Appellant was awake when his erect penis was pushed up against her buttocks*. AM testified she felt Appellant's penis against her buttocks for about "30 minutes." When asked if she tried to move away from Appellant, she responded, "Yes, when I felt like he was sleep [sic] because he was snoring. So I was trying to move but he like--I guess he woke up and like moved me back because I know for sure he moved me back because I tried to get up . . . ."

What is most telling is that AM agreed with counsel that Appellant did not move his penis around, nor did he thrust his penis against AM. Had Appellant been awake and grinding or thrusting against AM without an erection, a reasonable factfinder could say the intent to gratify sexual desires is met.

As for a male erection while sleeping, Colonel (Dr.) KL an expert in obstetrics and gynecology, testified that men can get an erection when they are not sexually aroused. Col KL indicated men have "random erections" throughout the day, but are "most common at night when they're sleeping and they last about 20 to 30 minutes." Col KL confirmed that "men do get erections when they're truly sleeping," and that the reasoning for this is "thought to be like a chemical reaction, sheet rubbing, random events that happen throughout the course of the night." Further, Col KL noted that continuous two-hour erections (as noted shortly) are not common and that is it common for men to have five to six erections a night.

Col KL's expert testimony, plus the lack of movement by Appellant with his penis, plus the fact that Appellant was drunk,[5] plus the fact that AM *could not* testify Appellant was awake when all of this was allegedly happening, shows the Government did not prove Appellant's intent to gratify his sexual desire. Additionally, the Government did everything possible in this trial to paint a picture of an aggressive individual (including the testimony of KH and the

---

[5] In her AFOSI interview, AM acknowledged she told agents that, "[Appellant's] drunk, he don't [sic] know what he is doing probably."

kiss), yet, while in bed with two other women, Appellant is not moving—his behavior with AM goes against every fact, inference, and expectation an observer would now come to expect from him.

Based on this part of AM's testimony alone, I do not believe Appellant's conviction for abusive sexual contact is legally sufficient. If one is to believe AM is credible, then part of AM's testimony *plays in favor* of Appellant since she went so far as to admit she did not know if Appellant was *ever* awake and that he was not being aggressive, by not rubbing, thrusting, or moving his penis against AM's body, which challenges whether the Government met its burden to prove that Appellant intended to gratify his sexual desire. With that said, there are several indicators to question AM's credibility and believability. At the beginning of her testimony, after Appellant gets in bed, she says she tried to wake DB up by "grab[bing] her hair," but DB was a "really heavy sleeper," so that did not work. This is suspect given MM's (AM's sister's) testimony about where AM may have been positioned in the bed. MM testified as follows:

> Q. [Trial defense counsel] Okay. [MM], what did your sister, [AM], tell you happened to her?
>
> A. [MM] All I remember was she told me was that [AM] and [DB] were laying in [Appellant's] bed, and [AM] was close to the wall, and [DB] was on the other side, and that [Appellant] came up the stairs and laid next to [AM], and put his arms around her while he laid down in the bed. That's what she told me.
>
> Q. Did she tell you what happened next?
>
> A. No, that's just all she told me.
>
> Q. She didn't tell you about getting up out of the bed?
>
> A. Oh, yeah. She said that she tried to wake [DB] up, but [DB] wouldn't wake up and she just got out the bed.
>
> Q. Your testimony today is that [AM] said she tried to wake up [DB] but [DB] never woke up?
>
> . . . .
>
>  A. No, [DB] didn't like wake up.

Despite this testimony, MM later admitted this was inaccurate:

> Q. [Trial defense counsel] And do you remember telling us that [AM] explained to you she woke up [DB] and the two of them switched places in the bed?
>
> A. Yes, I'm sorry. They did switch places in the bed.

31

Q. So, [AM] did tell you that she woke up [DB]----

A. And then they switched places----

Q. ----and they switched places in the bed?

A. Yes.[6]

Additionally, FD (DB and Appellant's roommate), testified that DB told her that when Appellant got in the bed with her and AM, Appellant got "in the middle" of the bed.

Returning to the issue of Appellant's erection, AM testified she felt Appellant's erect penis against her buttocks for about 30 minutes. However, in discussing the incident with AFOSI, AM led agents to believe that Appellant had an erect penis the entire time he laid next to her, which would have been for approximately *two hours*. Additionally, there was some question as to whether AM even knew if Appellant was erect. Instead of answering yes or no, the record shows a fair amount of confusion on the part of AM. When trial defense counsel reminded AM that in a pretrial interview with the defense team, AM told them that she did not actually know if Appellant was erect, AM responded, "Yes, but that's because . . . [trial defense counsel] said that 'I mean, you guess right, you don't really know?' So, [trial defense counsel] made me rethink about what I said." On re-direct examination, AM was asked by trial counsel to explain this statement. AM responded,

> [Trial defense counsel] asked—not asked but I guess made a statement like "you guess because you don't really know, right?" So, I rethought what I said. That's why I was—well, I wasn't confused, but I was like well I guess that's what it means, like— because he had asked like how would you know if it's hard or not and I just would know. It's just I guess just something that I know, so.

When AM met with the Defense in a pretrial interview, AM told them she "had never felt a penis before;" that is, before Appellant touched her with his penis. Further, trial defense counsel reminded AM of her interview with AFOSI and when agents discussed erections. She was reminded of how she told AFOSI, "I don't know how that works," and that Appellant had an erection the "entire time that we were sitting there." AM testified Appellant climbed into his bed behind her, put his arms around her and touched her thighs, then touched her buttocks with his penis. With regard to Appellant's penis, she testified, "A few seconds after [Appellant touched her with his arms], I felt him

---

[6] The military judge considered this portion of MM's testimony for impeachment purposes.

get hard." When asked by trial counsel what she meant by this, she said, "An erection, I think that's what it's called. Yeah." If one believes this is confusing, it is. The majority takes exceptions to challenges to AM's candor, however, I bring this information simply to show that it should not have been this difficult for AM to explain what she felt, and keeping in mind that she was the only witness to Appellant's alleged acts, her confusion cuts across her believability as to what actually happened.

Regarding the text message AM sent to a friend, at 5:12am, AM texted her friend and stated, Appellant "gon come right next to me and lay close [as f*ck] & i didn't know what to do. He keeping getting closer & closer when i was moving away from him. I could feel everything he was doing or was trying to do." When AM had the opportunity to tell someone what Appellant had done, she did not describe an assault or a sexual assault, only that Appellant laid close to her.

Finally, AM testified that when she tried to get up, Appellant pulled her back. However, in her AFOSI interview (and despite having watched her AFOSI interview the week prior), AM could not remember during her testimony at trial if she told AFOSI anything about trying to get up and being pulled back by Appellant.

The majority points out that Appellant's words the next day to DB and AM indicate some sort of consciousness of guilt, yet, this is countered with MM's testimony that AM did not say anything more other than Appellant laid next to her. Further, there is some additional context to this: when the incident occurred, despite AM's efforts to wake up DB to let her know what was happening, DB remained asleep. When DB eventually awoke, AM told her she had gotten up because there was no room in the bed. Appellant was "out cold" when DB woke up that morning. AM attempted to try and wake Appellant up because he was supposed to take her (AM) to work. AM did not report the incident immediately, although she did confront Appellant a few days later and told him, "I didn't like what happened the other night," and, "Hey, don't make it a habit." Appellant responded to her, stating that DB talked to him about it, but he "didn't think it was a big deal" and that he was sorry. This is hardly a confession or admission—neither AM nor Appellant provided any additional context, and given DB and AM's testimony about trying to wake Appellant up, there was no evidence Appellant even knew what they were referring to. Even after Appellant allegedly committed these acts against her, AM continued to go back to Appellant's apartment throughout the summer of 2018, until DB moved out.

In order to get to legal and factual sufficiency for the alleged sexual assault based on AM's testimony, I would have to disregard that: 1) DB and AM felt comfortable sleeping in Appellant's room and in his bed, and remained in that

bed for hours after he got into his bed with them, despite DB having made an allegation of sexual assault against Appellant; 2) AM was unable to get away from Appellant who was in and out of sleep, after only a few seconds of holding her down; 3) AM stated that she did not know if Appellant was ever awake; 4) AM decided to remain next to Appellant who may or may not have had an erect penis for as few as 30 minutes, or as long as two hours, despite the fact that he "reeked of alcohol" (additionally, the discrepancy between how long Appellant may have had an erection causes me to question what "a few seconds" meant to AM, when she testified about what happened when Appellant got in bed with her); 5) AM was not able to wake up DB, the other individual sleeping next to her, during the two hours this allegedly abusive sexual contact occurred; 6) the impeachment testimony that Appellant *was in between DB and AM*, and not against the wall, which would suggest that DB was not as heavy a sleeper as AM suggested, and in turn, a further challenge to her credibility; and finally 7) it was only after Appellant got into a fight with FD that AM decided to bring forth her allegation to authorities.[7]

After viewing the evidence in the light most favorable to the Prosecution, based upon AM's own testimony, I do not see how any rational trier of fact could have found the element of Appellant's intent to gratify his sexual desire beyond a reasonable doubt. Even if a rational trier of fact could have found that element, after weighing the evidence in the ROT and making allowances for not personally having observed the witnesses at issue, taking into account AM's testimony and inconsistencies, and whether Appellant had the intent to gratify his sexual desires by touching AM's buttocks with his erect penis, the evidence and testimony is not fully credible or believable, and is not factually sufficient to support Appellant's conviction of abusive sexual contact.

As for Appellant's conviction for assault consummated by a battery, this is a general intent crime. Appellant need only have intended to commit the act that constituted the offense. Appellant allegedly touched AM "a few seconds"

---

[7] In his brief, Appellant insinuates that four of the victims in this case, AM, MM, FD, and DB, colluded with each other, stating that victim FD wanted revenge against Appellant for calling the police "on her for bringing a guest into their shared apartment" in summer 2018. FD was the first to bring an allegation against Appellant, followed by the remaining three. As Appellant notes, "In [FD] and [DB]'s cases, their fabrications shown through so clearly, [Appellant] was acquitted of the specifications associated with them, as [FD] tried to corroborate stories with other witnesses during the trial and DB admitted that [Appellant] did not rape her." The record suggests that collusion among these victim witnesses is certainly a possibility, but, because I believe AM's testimony and credibility stands on its own, and that the specification related to MM is legally and factually sufficient, in part, because it is supported by other evidence, I do not believe collusion to be an issue that requires further discussion.

after he got into the bed. When asked by trial defense counsel if AM actually knew for a fact Appellant was *ever* awake—she responded, "I can't say that, no." Based on the facts already articulated, while I believe this charge and specification is legally sufficient, having weighed the evidence in the record of trial and having made allowances for not having personally observed the witnesses, I am not convinced of Appellant's guilt beyond a reasonable doubt with respect to Charge III and its Specification.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court